Filed 10/27/14  Williams v. McCullough CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| GREGORY J. WILLIAMS, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> THOMAS B. McCULLOUGH, <br>as Trustee, etc., <br><br> Defendant and Appellant. | B250028 <br><br> (Los Angeles County <br>Super. Ct. No. SP006932) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Joseph S. Biderman, Judge.  Affirmed with directions.

Freeman, Freeman & Smiley, Stephen M. Lowe and Thomas C. Aiken for Defendant and Appellant.

Mary L. Williams; Joseph DiGiulio; and Howard C. Posner for Plaintiff and Respondent.

_____

Thomas B. McCullough appeals after a court trial in which the court reduced the amount of fees payable to him as trustee of the Annabelle Herman Trust (Trust). McCullough contends the trial court erred in reducing his compensation, arguing: (1) the burden of proving the unreasonableness of the trustee's fees was on the trust beneficiary challenging the amount of fees collected; (2) the evidence did not support the reduction of McCullough's fees; and (3) ambiguities in the statement of decision could not be construed against McCullough. We conclude the court did not abuse its discretion in reducing the amount of fees payable to McCullough. We affirm the court's decision and remand the matter with directions to specify the precise dollar amount McCullough is required to reimburse the Trust for excessive fees collected and to enter judgment accordingly.

## BACKGROUND

### A. The Trust

Annabelle Herman created the operative Trust on February 14, 2004. The Trust assets consisted of real property located in Hawaii and Sherman Oaks. The Trust was held for the benefit of Herman's sole living offspring, Barbara Goldsmith. Williams, Herman's grandson by her deceased daughter Michelle, was designated the beneficiary in the event of Goldsmith's death. Herman also had a brother, Irwin Weiner.

On November 5, 2006, Herman passed away. McCullough was appointed successor trustee on November 17, 2006. The trust corpus consisted of a four-unit residential property in Sherman Oaks, a condominium unit in Hawaii, and $130.18 in cash. The value of the trust estate in November 2006 was $1,002,630.18. Cash was needed to care for Goldsmith. McCullough facilitated the sale of the Hawaii condominium unit in May 2007, hiring a law firm and a realtor. McCullough facilitated the sale of the Sherman Oaks four-unit property in April 2008. Prior to the sale of the Sherman Oaks property, Weiner was living in one of the units. McCullough hired attorneys to enter into a settlement agreement on behalf of the Trust with respect to Weiner's potential life estate in the unit. McCullough also hired attorneys to pursue an unlawful detainer action against another tenant of the Sherman Oaks property.

2

Goldsmith passed away in October 2011, making Williams the sole remaining beneficiary of the trust.

## B. The petition for review of trustee fees

Although McCullough paid himself from the Trust estate, Williams never received a formal accounting from him. On August 17, 2012, Williams filed a petition asking the trial court to review the fees collected, set reasonable trustee fees, and order McCullough to reimburse the Trust for unreasonable trustee fees already paid (petition). The petition also requested that the court order McCullough to provide billing records and accurate information on the gross sales price and net sale proceeds for the Sherman Oaks real property.

On November 15, 2012, McCullough provided Williams's attorney with billing records purporting to document his services to the Trust. The records McCullough produced consisted in part of invoices that McCullough had submitted to himself for extraordinary services to the Trust from 2007 to 2011. The invoices treated as extraordinary services tasks such as making telephone calls, opening certificates of deposit at banks, picking up a will, making a key, reviewing letters, and holding conferences, all billed at an hourly rate of $375.

Williams filed a supplement to the petition on November 29, 2012, stating McCullough had paid himself 2 percent of the gross value of the Trust estate as fees for ordinary services, but that McCullough's supporting documents failed to disclose whether the services described in the documents were performed in McCullough's capacity as an attorney or as the trustee, who provided the services, or the identity of the client. Williams claimed McCullough provided no records supporting some of the bills; the bills were inflated; even though most of the extraordinary services were performed before the sale of the real properties, McCullough paid himself $128,186.02 for extraordinary services he claimed to have performed after the sale of the real properties; and McCullough charged the Trust for determining what services McCullough should charge as ordinary.

3

On December 6, 2012, McCullough filed an opposition to the petition, requesting he be ordered to file a complete accounting. At a hearing on the petition, McCullough's attorney stated if Williams's attorney stipulated that only the reasonableness of the fees was at issue, "we can go ahead and litigate the petition." Williams's attorney explained McCullough had already provided two informal accountings and implied she did not want the Trust to be billed for McCullough's preparation of a formal accounting. The parties stipulated that the reasonableness of McCullough's fees—and not the sales price of the Sherman Oaks property—would be the only issue for trial, thereby obviating the need for a formal accounting.

## C. Mary Williams's declaration attached to the petition

Mary Williams, to whom we refer as Ms. Williams, is Williams's aunt and attorney. Ms. Williams attached a declaration to the petition, stating as follows. Ms. Williams had worked with McCullough on a previous matter and recommended him to Williams as a trustee. After Goldsmith died on October 17, 2011, Ms. Williams requested documents from McCullough showing the Trust balance on multiple occasions. Although she was informed by McCullough the balance was "approximately $400,000," she never received any documents showing the balance of the Trust on the date of Goldsmith's death.

On February 12, 2012, Ms. Williams received documents from Attorney Stephen Lowe, representing McCullough. The documents showed the Trust balance was currently $420,076.71, comprised of three bank accounts in two banks. One account had been opened with a deposit of $208,969 on November 28, 2011, with no indication where the money had come from. On March 5, 2012, Lowe e-mailed Ms. Williams stating the balance was $434,184.18 as of October 17, 2011, but did not provide her with supporting documents. He advised her that his paralegal would have to go through records in storage to provide her with a summary of expenses.

On April 12, 2012, McCullough provided three documents to Ms. Williams in response to her request for an informal accounting. A document entitled, "Register Report:6" (register), showed income to the Trust and expenses paid by the Trust from

4

April 10, 2007, to March 15, 2012. The register showed McCullough made payments on behalf of Goldsmith in the amount of $217,044.74 and paid himself $190,834 in trustee's fees.

A document entitled, "Summary of Services" (summary of services), stated McCullough charged 2 percent of the gross value of the Trust estate assets for his ordinary services. The document used a narrative form to describe the services and fees charged by McCullough to the Trust. These included services such as resolving financial and care issues for Goldsmith, administering the Hawaii condominium unit, resolving issues with the Sherman Oaks property, managing investments, addressing issues on Goldsmith's death, and hiring a tax attorney. The summary of services described the services in very general terms and did not indicate how much time McCullough spent on the purported ordinary and extraordinary services, but claimed a total fee of $127,500.

The third document, entitled, "Ordinary Fees for . . . McCullough . . . at 2% per annum" (ordinary fees), showed that, from November 17, 2006, until December 31, 2011, McCullough paid himself $70,348.94, based on the 2 percent annual fee for ordinary services.

On May 21, 2012, Ms. Williams requested more documents supporting McCullough's payment to himself of trustee's fees. At various times, Lowe informed Ms. Williams the documents required to render an accounting were in storage, McCullough was moving his office, and McCullough's paralegal was on vacation and there would be a delay in providing the documents. On August 1, 2012, Lowe sent Ms. Williams a letter, attaching documents showing fees paid to a Hawaii law firm in the amount of $5,267.29 for legal services for the Hawaii condominium unit, and payment to a local lawyer in the amount of $1,730 for an unlawful detainer action concerning the Sherman Oaks property.

## D. Supplement to petition

Williams filed a supplement to the petition, asserting McCullough paid himself $212,371.40, but billed the Trust $182,867.98, of which $67,876.67 was for ordinary services and $114,991.31 was for extraordinary services. Attached to the supplement

5

was Ms. Williams's declaration, which identified inconsistencies, ambiguities, duplications, missing pages, excessive billings, billings for extraordinary services which should have been for ordinary services, and gaps in the records provided by McCullough.

Ms. Williams declared as follows. McCullough did not show whether he was billing as an attorney or as a trustee. McCullough wrote checks to himself from the Trust account for $15,880.40 and $5,657 that were not included in the register. McCullough provided no records dated after November 29, 2011, but paid himself $18,232.55 between December 13, 2011, and February 27, 2012. He provided no records between October 29, 2008, and November 15, 2009, but paid himself $33,627.75 during that period of time. McCullough also made large lump sum payments to himself for $20,000 and $10,000 several times. McCullough charged the Trust approximately $4,000 to decide what he should bill as ordinary fees, including charges for travel time to retrieve documents. Most of the extraordinary services were completed by the time the Sherman Oaks property was sold on April 4, 2008, but McCullough paid himself $128,186.02 between 2009 and 2012.

Additionally, McCullough's billings for telephone calls with Ms. Williams were "far in excess of [her] telephone billing statements" when she compared her bills to his billing records. Examples of excessive billings included a bill of $600 for making keys, a bill of $486.25 for McCullough's having escrow documents notarized while he was in Guam, and a bill for $525 for picking up a will from another attorney's office.

## E. Declaration of McCullough

On February 15, 2013, McCullough filed a supplemental declaration in support of his request for fees for additional services as trustee. He declared as follows. He discovered an "error" in that he had overpaid himself $21,537.40. Thus, for the period ending March 15, 2012, he revised the amount he claimed to $154,983.16 for services rendered by himself and $37,850.84 for services rendered by attorneys who worked for him.

McCullough claimed additional ordinary fees of $873.62 for the period between January 1, 2012, and February 7, 2012; additional ordinary fees of $3,785.12 for the

6

period between February 8, 2012, and December 31, 2012; additional unpaid extraordinary fees between "2006 through May 2008" in the amount of $9,058.25 for review of Goldsmith's health and living arrangements, management of the real properties, sale of the Hawaii condominium unit, settling Weiner's interest, and issues with tenants; additional unpaid costs of $3,839.31; additional extraordinary fees since November 2011 of $12,150 regarding Ms. Williams's requests for information related to the Trust, payment of fees, and records; and additional fees of $12,693 paid to attorneys to prepare accounting materials in response to Ms. Williams's requests for information.

McCullough claimed a total of $25,866.99 in additional compensation to be offset by the $21,537.40 "error," for a total claim of $4,329.59 for additional compensation.

## F.  Trial testimony

### 1. *McCullough's testimony*

McCullough testified as follows.  McCullough set a fee of 2 percent annually of the gross Trust assets for ordinary services and $375 per hour for extraordinary services.  Ordinary services consisted of administering the Trust, including writing checks and making telephone calls.  Extraordinary services included making a trip to a bank in order to negotiate a better certificate of deposit rate to invest the Trust assets.

After he was appointed successor trustee, McCullough hired a law firm in Hawaii to sell the Hawaii condominium unit.  He also hired an attorney to represent the Trust at hearings and a tax attorney to prepare tax returns.  McCullough obtained a line of credit to pay for Goldsmith's care.  He hired Ron Olan, a "de facto conservator," to care for Goldsmith, move her to an apartment, and help her with her health issues.  Olan sent itemized bills to McCullough for review.

McCullough paid himself "on occasion" a lump sum rather than billing and paying himself monthly.  At some point, McCullough realized he inadvertently had paid himself $21,000 and $26,664.36 out of the line of credit.  McCullough "lumped in" all the extraordinary services together in his billing records.  Upon being shown "a number of entries" referring to "'office conference,'" for which he sought additional compensation from the Trust, McCullough was unable to identify with whom he had conferences.  He

7

opined they could have been conferences with independent contractor attorneys he had hired to handle an unlawful detainer action concerning the Sherman Oaks property. McCullough testified the independent contractor attorneys submitted invoices to him, which he destroyed at the end of each year.

After Williams demanded records regarding the Trust, McCullough began gathering records from storage and hired a firm to prepare to do an accounting. McCullough billed as extraordinary fees the work his paralegal did in compiling an accounting in response to the petition, but McCullough did not produce her invoices for trial.

McCullough requested additional extraordinary fees of $12,150 that he had not billed the Trust. McCullough admitted his request for additional costs included some duplicate billings. McCullough was unable to identify the source of several $5,000 and $10,000 deposits to his account as trustee fees. McCullough was unable to explain why the Trust was billed for Internet research charges of approximately $3,000.

### 2. *Ms. Williams's trial testimony*

Ms. Williams testified as follows. She requested from McCullough records supporting his trustee's fees because she could not understand how he billed for his services. After she received his documents, she realized McCullough had paid himself more than his invoices reflected he should have received. Ms. Williams testified it was unclear from some of the documents provided by McCullough what services were billed as ordinary services and what services were billed as extraordinary services because McCullough lumped them together. After Goldsmith's death there was very little work to do on the Trust, yet McCullough continued to bill for extraordinary services. He provided no records from October 29, 2008, to November 15, 2009, but paid himself $33,000 during that time.

Ms. Williams received a document purporting to describe extraordinary services, which included entries such as a bill for $525 for picking up a will from an attorney's office; bills for telephone calls and e-mails; bills for meetings prior to the sale of the Hawaii condominium unit regarding investing Trust funds; and for lump sum payments

in the thousands of dollars, which did not indicate when or for what services McCullough was paid. McCullough included payments to independent contractor attorneys within his trustee's fees.

In 2010, McCullough began billing the Trust for determining how much he paid himself for ordinary fees as of 2006. McCullough paid himself $21,537.40 from the line of credit, which McCullough admitted was a mistake. McCullough also admitted he had erroneously paid himself $26,664. He also reimbursed the Trust $18,000 for an unknown reason.

## G. The statement of decision

On April 19, 2013, the trial court issued a statement of decision, determining as follows.

Pursuant to stipulation of the parties, the only issue was whether the trustee's fees paid to McCullough were reasonable.

McCullough ably performed his duties and his services benefited the Trust. On November 17, 2006, the value of the trust estate was $1,002,630.18, consisting of the Hawaii condominium unit, the Sherman Oaks real property, and cash in the amount of $130.18. The Hawaii condominium unit was probated in Hawaii and sold in May 2007 for $275,000. Net sales proceeds were $251,000. McCullough obtained a $200,000 line of credit secured by the Sherman Oaks real property, which had a court-approved sales price of $727,500. The Sherman Oaks real property was sold on April 4, 2008; net sales proceeds were $532,282.36. McCullough entered into a settlement agreement with Weiner requiring Weiner to move from the Sherman Oaks property in exchange for a sum of money. An unlawful detainer action also was filed as to another tenant at the Sherman Oaks property.

The bulk of McCullough's claim for extraordinary services was for services performed after the sale of the two real properties, when the Trust estate consisted entirely of cash.

There were three issues to be resolved: "(1) whether the Trustee maintained proper and accurate records, (2) whether the Trustee specified and itemized proper

9

specific extraordinary services and the fees paid to him therefor, and (3) whether the fees that the Trustee paid to himself were reasonable within the law, including the custom and practice of the community."

McCullough's base fee for ordinary services of 2 percent of the gross Trust estate value was "at the very high end of reasonable fees and . . . therefore, the bulk of the Trustee's work should be considered not to be extraordinary services."

"Article 3.10 of the Trust provides that '[a]ny individual Trustee shall pay himself or herself reasonable compensation for services rendered . . . and shall reimburse himself, herself or itself for any expenses of the trust estates that such Trustee has paid.'"

Probate Code section 15686 provides a trustee's base fee does not include fees for extraordinary services, and McCullough "is therefore entitled to reasonable compensation, which may properly be based upon a base fee and hourly extraordinary services." McCullough's fee of $70,348.94 based on 2 percent of the gross Trust estate for the years 2006 through 2011 was reasonable.

The fees received by McCullough as extraordinary fees were not reasonable.

"a. The Trustee charged an hourly rate of $375.00 for extraordinary services, which although less than what the Trustee bills as an attorney, is excessive for work that does not require the skill and expertise of an attorney. By way of examples, this is an excessive fee for tasks such as obtaining or delivering documents, banking, or managing real estate.

"b. The Trustee was paid $79,079.10 for extraordinary service performed during [i.e., between] 2006 and 2011. The Summary of Services, Exhibit 102, is confusing and unspecific. It does not accurately and adequately describe the nature of the work and the result achieved. The amount is not reasonable in light of the difficulty and complexity of the tasks faced.

"c. The Trustee testified that his ordinary services are very broad and it depends on the trust and that even if he had done nothing, he would still be entitled to trustee fees. He was unable to explain what ordinary trustee duties included but admitted that it included writing checks. Exhibit 3 contains his services and billings for extraordinary

10

fees. Activities related to certificates of deposit . . . are a combination of ordinary and extraordinary fees. He would personally travel to the institution to get a better rate. His Summary of Services (Ex. 102) is a compilation of ordinary and extraordinary services but does not delineate among billing categories. He went through his old records to come up with unpaid extraordinary services for which he did not previously bill (Ex. 108). He asserts billing paralegal time as extraordinary services. The records are of limited usefulness in assessing the value of the work performed. Despite multiple entries therefor, the Trustee could not testify with whom and for what he had office conferences that are set forth in Exhibit 3.

"The trustee utilized three attorney independent contractors who submitted monthly statements to him for services rendered to the Trust. At the end of each year, these statements were destroyed for some unknown reason. Therefore, he cannot determine what they billed the Trust. He got the figures for Lauriann Wright and the other attorneys from itemizations that they did as set forth, for example, in Exhibit 3, page 103. He would then incorporate their time records into his Trustee invoices for services rendered to the Trust. There were numerous irregularities and outrageous billings for payments to himself such as a charge of 1.75 hours for a total of $525 to retrieve an original will from attorneys in Century City, charges of several thousands of dollars in 2010 for figuring out what his ordinary fee payments should be (Ex. 3, pp. 78-79), and charges for renewing and otherwise dealing with [certificates of deposit] which are contained throughout Exhibit 3."

McCullough "is entitled to receive $138,675.09 through December 31, 2011, which is comprised of $70,348.94 for ordinary services, $26,600.00 for extraordinary services, $3,839.31 in costs, and $37,850.84 to the attorneys representing the Trustee."

McCullough had been paid $212,371.40. McCullough was entitled to be paid $19,854.74 for additional services through December 31, 2012, which included: "a. The Trustee is entitled to be paid a base fee in the amount of $4,685.74 for the year 2012. [¶] b. The Trustee is entitled to be paid for an additional $3,019.00 in unbilled extraordinary services. [¶] c. The Trustee is entitled to be paid for fees and expenses in the amount of

11

$12,150.00 for work related to preparation of a Trust accounting through December 31, 2012. [¶] d. The Trustee is entitled to pay himself as Trustee the amount of $4,613.78 which is the amount owed to the Trustee for his fees and reimbursed expenses through December 31, 2012."

McCullough "shall return forthwith to the Trust all monies he received in excess of the amounts set forth above."

The statement of decision ordered Williams to prepare and submit a proposed order.

## H. The proposed judgment

Williams submitted a proposed judgment against McCullough and in favor of Williams in the amount of $53,841.73, calculated as follows. According to the statement of decision, McCullough was entitled to receive $138,675.09 through 2011 ($70,348.94 for ordinary services, $26,600 for extraordinary services, $3,839.31 in costs, and $37,850.84) "for the attorneys representing [McCullough]." The statement of decision also provided McCullough was entitled to $19,854.74 for services rendered through 2012 and that he had received $212,371.40 from the Trust.

The proposed judgment ordered McCullough to return to the Trust $53,841.73 and distribute to Williams the balance of the Trust assets of $210,578.92 plus accrued interest as of February 8, 2012.

On May 2, 2013, McCullough objected to the proposed judgment's statement that judgment was entered against him and in favor of Williams in the amount of $53,841.73, claiming that the wording did not conform to the statement of decision, which stated, "'McCullough shall return forthwith to the Trust all monies he received in excess of the amounts set forth above.'" McCullough also objected to the specification of $210,578.92 plus interest as the amount to be returned, claiming the trial court had made no specific finding as to that amount, and "[a] trust may properly incur administration expenses and [McCullough] is entitled to wind up the affairs of the Trust in an orderly fashion."

On May 9, 2013, McCullough objected to the statement of decision, claiming it created ambiguities or failed to resolve controverted issues, including failing to establish

12

how extraordinary services were tied to McCullough's rate for ordinary services, omitting a finding as to the appropriateness of the trustee's fee for extraordinary services as a "blended rate," and placing the burden of proof on McCullough "regarding records."

On May 16, 2013, the trial court issued a minute order, which stated, "Statement of Decision stands as the Court's order." On May 21, 2013, Williams served on McCullough a "notice of the May 16, 2013 minute order" of the court.

On July 11, 2013, Williams filed a "petition for court's clarification of its statement of decision and request for subsequent order and judgment thereon," which was not heard because on July 15, 2013, McCullough filed a notice of appeal.[1]

## DISCUSSION

**The trial court did not abuse its discretion in reducing McCullough's compensation for extraordinary services**

**A. Legal Authorities**

### 1. *Standard of review*

A trustee's claim for compensation is reviewed for abuse of discretion. The trial court's "ruling will not be disturbed on appeal in the absence of a manifest showing of abuse. [Citations.]" (*Estate of McLaughlin* (1954) 43 Cal.2d 462, 465.) "[T]he sole question before an appellate court when the fee allowed [the trustee] is attacked as excessive is whether there is substantial evidence to support the trial court's finding." (*Id.* at p. 466.) Stated another way, the trial court's determination will be upheld unless it "'exceeds the bounds of reason.'" (*Id.* at p. 468.) Abuse of discretion is the standard of review when the trustee claims entitlement to fees for "extraordinary services." (*Estate of Lacy* (1975) 54 Cal.App.3d 172, 179.) McCullough's argument that the standard of review is de novo is unfounded.

---

[1] Pursuant to *Alan v. American Honda Motor Co., Inc.* (2007) 40 Cal.4th 894, 901, we exercise our discretion to treat the statement of decision as appealable.

## 2. *Burden of proof*

The parties stipulated and the trial court agreed the sole issue at trial was the reasonableness of the fees paid to McCullough.

The trustee has the burden of proving the reasonableness of his or her compensation. As our Supreme Court stated in *Purdy v. Johnson* (1917) 174 Cal. 521, 527, even where trustees have acted in good faith without overreaching, "'Trustees are under an obligation to render to their beneficiaries a full account of all their dealings with the trust fund [citations], and where there has been a negligent failure to keep true accounts, or a refusal to account, all presumptions will be against the trustee upon a settlement. [Citations.] [¶] The entire trial was conducted upon the erroneous theory that the burden of proof was upon the beneficiary to point out the particulars in which the account was erroneous, and that she was bound to go forward and establish affirmatively the impropriety of the charges and credits which she assailed. Such is not the law." The more recent decision in *Estate of McLaughlin* is in accord and cites *Purdy*. (*McLaughlin*, *supra*, 43 Cal.2d at pp. 465–466 [trustee must present satisfactory evidence to support propriety of charges].)

The rule that the trustee has the burden of proof applies when the trustee seeks compensation for "extraordinary services." (*Estate of Fulcher* (1965) 234 Cal.App.2d 710, 718.) Where such compensation is sought, "the trustee should be required to show in detail the nature and extent of such services rendered by it, as distinguished from its attorneys, and the time and effort entailed thereby over and beyond usual and ordinary services." If no such showing is made, an award "cannot stand." (*Estate of Bissinger* (1964) 60 Cal.2d 756, 771.)

Despite the foregoing authority, McCullough argues Probate Code section 15686 establishes a presumption that trustee fees are reasonable and that this presumption shifts the burden of proof to the beneficiary, at least when no formal accounting has been prepared. The argument is unfounded. Section 15686 does not create a presumption of reasonableness of a trustee's claim for fees. In fact, nothing is said in section 15686 about a presumption of reasonableness.

McCullough also relies on *Estate of Della Sala* (1999) 73 Cal.App.4th 463 for his contention Williams had the burden of proof. In *Della Sala*, the court correctly observed that a party making an affirmative claim for relief bears the burden of proof of all elements of his cause of action. (*Id.* at pp. 465, 470.) As best we can determine, McCullough's argument is that possession is 9/10 of the law. He seems to contend that, because Williams was the petitioner bringing the action, and because a person asserting an affirmative claim such as a petitioner or a plaintiff generally bears the burden of proof, Williams, who was seeking return of the money McCullough had overpaid himself, bore the burden of proof of his affirmative claim.

This demonstrates a misunderstanding of the law. Where a trustee overpays himself or herself and places the beneficiary in a position where he or she has to sue to get the money back, the underlying claim is a claim of the *trustee* for compensation. As is noted above, the trustee has the burden of proof as to all elements of his or her claim. To hold otherwise would be to give trustees license to misappropriate funds and force the beneficiary to sue them and then bear the burden of proof of nonentitlement to fees. This would place the beneficiary in the unenviable position of trying to prove a negative against his or her fiduciary. Moreover, the beneficiary would be disadvantaged because the information would be in the hands of the trustee.

The rule in the analogous authority concerning the recovery of fees by personal representatives and attorneys is that no fees can be taken by the personal representative or attorney until a court orders payment. (Cal. Rules of Court, rule 7.700(a).) Thus, personal representatives and attorneys are always the petitioner or claimant and always have the burden of proof. There is no reason to treat the burden of proof differently for a trustee seeking fees he or she already has collected.

McCullough also argues the authorities referenced above all involved matters in which the personal representative had performed an accounting before seeking compensation. This is hardly surprising because personal representatives cannot be paid until the court orders payment. Nonetheless, McCullough argues these are inapplicable because no formal accountings had been rendered. We disagree. There is nothing about

15

the absence of a formal accounting that alters the duties of the trustee to the beneficiary. Nor does the absence of a formal accounting make the beneficiary the claimant saddled with the burden of proof.  Again, an unfaithful fiduciary could wrongfully refuse to make any accounting to shift the burden of proof to the beneficiary, who would find it difficult to meet the burden without such an accounting.  Moreover, McCullough appears to be on shaky ground factually, as the statement of decision makes clear that the court awarded fees to McCullough for earlier informal accountings.  Indeed, a trustee is required to provide such accountings at least annually.  (Prob. Code, § 16062, subd. (a).)  Thus, the facts belie any contention by McCullough that he made no accounting.

We conclude the burden of proof as to the reasonableness of his fees rested squarely on McCullough.

### 3.  *Trustee's services and fees*

The law as to claims for fees for ordinary and extraordinary services has developed in part in the context of claims by personal representatives and their attorneys. The parties analogize to these authorities in discussing a trustee's claim for fees for ordinary and extraordinary services.  We follow suit when necessary, using authorities pertinent to personal representatives as authority applicable as well to trustees.

### a.  *Ordinary services provided by a trustee*

The ordinary services provided by a trustee include administering the trust (Prob. Code, § 16000), controlling and preserving trust property (*id.*, § 16006), making trust property productive (*id.*, § 16007), enforcing claims and defending actions (*id.*, §§ 16010, 16011), delegating powers to an agent and exercising general supervision over the agent (*id.*, § 16012, subd. (b)), and accounting to each beneficiary at least annually (*id.*, § 16062, subd. (a)).

### b.  *Extraordinary services provided by a  trustee*

The court may allow additional compensation for "unusual services—so-called 'extraordinary' services."  (*Estate of Hilton* (1996) 44 Cal.App.4th 890, 895.) "[A]dditional compensation beyond that fixed by the trust instrument may be allowed 'for special and extraordinary services, outside and beyond the general duties of the trust,

16

e.g., "services of a nature not usually required of a trustee and for which he would have had the right to employ another person."'" (*Estate of Bissinger*, *supra*, 60 Cal.2d at p. 770.)

Extraordinary services may include selling, leasing, exchanging, financing, or foreclosing real or personal property; carrying on decedent's business if necessary to preserve the estate or under court order; preparing tax returns; and handling audits or litigation connected with tax liabilities of the decedent or of the estate. (Cal. Rules of Court, rule 7.703(b).)

### c. *Compensation for ordinary and extraordinary services*

A trustee's fee for ordinary services is set at a percentage of the value of the trust. (E.g., *Estate of Hilton*, *supra*, 44 Cal.App.4th at pp. 894–895.) This percentage does not cover compensation for extraordinary services. (Prob. Code, § 15686, subd. (a).)

Probate Code section 15680, subdivision (b) allows for compensation of trustees for what frequently is called "extraordinary" services: "Upon proper showing, the court may fix or allow greater or lesser compensation than could be allowed under the terms of the trust in any of the following circumstances: [¶] (1) Where the duties of the trustee are substantially different from those contemplated when the trust was created. [¶] (2) Where the compensation in accordance with the terms of the trust would be inequitable or unreasonably low or high. [¶] (3) In extraordinary circumstances calling for equitable relief."

The amount of compensation for extraordinary services is to be what the court determines is just and reasonable. (Prob. Code, § 10801, subd. (a).)

Rule 7.703(a) of the California Rules of Court expressly authorizes a trial court considering an award of fees for extraordinary services to "consider the amount of statutory compensation [payment for ordinary services] when determining compensation for extraordinary services." In other words, if the compensation for ordinary services is on the high end of what is normally allowed and the amount sought for extraordinary services would make the total award to the trustee unreasonably high when added to the award for ordinary services, the court has discretion to reduce the amount of fees for

17

extraordinary services to make the overall result reasonable. (E.g., *Estate of Trynin* (1989) 49 Cal.3d 868, 874 ["If, under all the relevant circumstances, the amount awarded as ordinary compensation is fair and reasonable for all the . . . services, the court may disallow a request for extraordinary compensation even though some extraordinary services have been performed."].)

Rule 7.776 of the California Rules of Court sets forth a nonexclusive list of factors the trial court may consider in determining the amount of a trustee's compensation. These include the gross income of the estate; the success or failure of the trustee's administration; any unusual skill, expertise, or experience brought to the trustee's work; the fidelity or disloyalty shown by the trustee; the amount of risk and responsibility assumed by the trustee; the time spent in the performance of the trustee's duties; the custom in the community where the court is located regarding compensation authorized by settlors, compensation allowed by the court, or charges of corporate trustees for trusts of similar size and complexity; and whether the work performed was routine or required more than ordinary skill or judgment.

### 4. *Statements of Decision*

If a party does not request a statement of decision, a reviewing court will presume the trial court made whatever findings of fact are necessary to support the judgment. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 61.) By requesting a statement of decision, a party who has not prevailed avoids this result. (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 494.)

A statement of decision must disclose the "factual and legal basis for [the trial court's] decision as to each of the principal controverted issues at trial . . . ." (Code Civ. Proc., § 632.) It need not discuss every subsidiary issue. (*Wolfe v. Lipsy* (1985) 163 Cal.App.3d 633, 643, disapproved on other grounds in *Droeger v. Friedman, Sloan & Ross* (1991) 54 Cal.3d 26, 36–39.) "[S]pecial findings are not required on every subsidiary matter . . . even though the subsidiary matter is relevant to the ultimate issues of fact." (*Kuffel v. Seaside Oil Co.* (1977) 69 Cal.App.3d 555, 565.)

18

A statement of decision must set forth ultimate facts and need not set forth evidentiary facts. (*Lynch v. Cook* (1983) 148 Cal.App.3d 1072, 1080.) The trial judge is not required "to make minute findings as to individual items of evidence." (*People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 524, overruled on other grounds in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 184–185.) The trial court is not required "to reveal to the parties the process by which it arrived at its figures." (*Gordon v. Wolfe* (1986) 179 Cal.App.3d 162, 168.) "'Findings of fact relating the process of a calculation which is the basis of an ultimate fact, ordinarily, are not required.'" (*Id*., at p. 167.) As our Supreme Court observed in *Estate of McLaughlin*, when a fee is attacked as excessive, "[a] finding that such a fee is a reasonable one states the ultimate fact in issue and is formally sufficient." (*McLaughlin*, *supra*, 43 Cal.2d at p. 466.) By a parity of reasoning, when a fee is attacked as excessive, a finding that such a fee is *un*reasonable would be a finding of ultimate fact that would be sufficient.

Even in cases where the trial court has failed to make findings "on a material issue which would fairly disclose the trial court's determination," "if the judgment is otherwise supported, the omission to make such findings is harmless error unless the evidence is sufficient to sustain a finding in the complaining party's favor which would have the effect of countervailing or destroying other findings. [Citation.]" (*Sperber v. Robinson* (1994) 26 Cal.App.4th 736, 745.)

"'Where a statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.'" (*In re Marriage of Ruelas* (2007) 154 Cal.App.4th 339, 342.) Moreover, "[t]he ultimate facts found in the court's statement of decision necessarily include findings on the intermediate evidentiary facts that sustain them." (*Community Youth Athletic Center v. City of National City* (2013) 220 Cal.App.4th 1385, 1407.)

19

However, where a party makes a sufficient objection to a proposed statement of decision, "it shall not be inferred on appeal" that the trial court decided the facts in question in favor of the prevailing party. (Code Civ. Proc., § 634.)

## B. The trial court did not abuse its discretion in reducing the amount of McCullough's extraordinary fees

McCullough contends (1) the trial court abused its discretion in reducing the amount of extraordinary fees, and (2) the statement of decision was inadequate. We disagree.

### 1. *The trial court could have reduced McCullough's fees in the way it did simply because McCullough did not bear his burden of proof*

#### a. *McCullough did not maintain proper and accurate records*

As discussed above, McCullough bore the burden of proving his claim for extraordinary fees. He was required to keep proper records and prove every item of his payment to himself, and to independent contractor attorneys, by satisfactory evidence. (*Estate of McCabe* (1950) 98 Cal.App.2d 503, 505.)

Most of McCullough's documents and testimony supporting his request for extraordinary fees were confusing, inaccurate, and lacked detail regarding the nature of the work and the result achieved. The summary of services was not a proper record of his services because it was in narrative form, did not distinguish between extraordinary and ordinary services, and did not specify how much time was spent on the matters even though McCullough charged $375 per hour for those extraordinary services. McCullough even had discarded the records of the attorneys he hired for various tasks, making it impossible for the court to confirm his claim that he had done most of the work on the projects for which attorneys were retained.

#### b. *McCullough did not specify and itemize proper extraordinary services and fees*

McCullough was required to show the extraordinary services for which he sought additional compensation were beyond the general duties of a trustee. (*Estate of Bissinger*, *supra*, 60 Cal.2d at p. 770.) He failed to do so.

20

McCullough's summary of services was in narrative form, lumped together extraordinary and ordinary services, and did not specify hours billed. Administering the trust, delegation and supervision of agents, and preserving trust property are general duties of a trustee. (Prob. Code, §§ 16000,16006, 16012, subd. (b).) Yet in his summary of services McCullough charged as extraordinary services $5,000 for the initial administration of the trust; $5,900 for opening certificates of deposit; $6,200 for hiring a tax attorney, and $25,000 for hiring and writing checks to Olan and paying Goldsmith's bills. For none of those purported extraordinary services did McCullough show how many hours he spent on those duties, even though he charged an hourly rate.

Although some of McCullough's services in selling the Hawaii condominium unit may have been extraordinary, he also claimed extraordinary fees for making telephone calls, writing letters, hiring a law firm, hiring a realtor, and having conferences. At trial, McCullough was unable to recall what the conferences he billed for were about or with whom, guessing they had something to do with the sale of the real properties. Additionally, McCullough billed paralegal time as extraordinary services, but the documents did not describe the type of services they provided or why the services were necessary.

**2. *McCullough's own evidence established parts of his claims for extraordinary services were unreasonable***

Where McCullough did provide specific information as to the services he claimed were extraordinary, he demonstrated in several instances that his charges were unreasonable. For instance, McCullough charged the Trust $525 in extraordinary fees for retrieving a will, $600 to make keys, and $375 to retrieve documents from storage. Invoices show McCullough paid the Hawaii law firm only $5,267.29 to handle the Hawaii condominium unit, yet in the narrative summary of services, McCullough claimed extraordinary fees of $14,600 for himself in connection with its sale. He was unable to substantiate his claim that this was because he did most of the work himself.

The trial court also heard live testimony from McCullough and Ms. Williams, and received their declarations. In making the factual determination as to whether

21

McCullough's claims for extraordinary services were reasonable, the court was able to assess the credibility of the witnesses and utilize its impressions about them in reaching its decision.

The court possessed substantial evidence to support its determination the amount of McCullough's claim for compensation for extraordinary services was unreasonable, and to determine the amount that would be reasonable.

### 3. *The statement of decision was adequate*

McCullough argues that, because he objected to purported ambiguities in the statement of decision, such ambiguities cannot be construed against him on appeal. This argument does not assist him. While McCullough is correct to the extent that we are not permitted to infer the existence of all factual findings necessary to support the judgment, we are directed, nonetheless to resolve all conflicts in the evidence in favor of the statement of decision. Moreover, we are charged with determining whether the court disclosed the factual and legal basis for its findings as to the controverted issues, not subsidiary issues. Likewise, our concern is with the court's findings of ultimate, not evidentiary, facts. Even if the court did omit to address material facts, the error would be harmless unless the evidence in the record before us were sufficient to sustain a finding in McCullough's favor of a magnitude that would destroy all other findings in Williams's favor.

McCullough's main complaint about the statement of decision itself is that the trial court did not explain precisely how it calculated his fees. The court was not required to do so. The ultimate issues were whether McCullough's proposed total compensation was reasonable and if not, how much was reasonable. As our Supreme Court observed in *Estate of McLaughlin*, when a fee is attacked as excessive, "[a] finding that such a fee is a reasonable one states the ultimate fact in issue and is formally sufficient." (*McLaughlin*, *supra*, 43 Cal.2d at p. 466.) The same is true when the court finds the fee was unreasonable, as it did here.

The trial court articulated its findings as to material issues of fact necessary to its decision as to reasonableness. These included that the bulk of the extraordinary fees

22

McCullough claimed was for services performed after the sale of the two real properties. The court was entitled to conclude the charges for extraordinary services performed after the sales were not attributable to truly extraordinary services because the work left for the trustee to do after sale of the properties consisted mostly of ordinary services.

Another ultimate fact found by the court was that McCullough's fee of 2 percent for ordinary services was "at the very high end of reasonable fees." In addition, the court found the ultimate fact that McCullough's hourly rate of $375 was an unreasonable rate for the kinds of non-legal work McCullough was charging at that rate, even though it might have been lower than the rate McCullough charged for legal services.

The court noted that, because the 2 percent rate was so high, it was reasonable to consider that the "bulk" of McCullough's "work should be considered not to be extraordinary services . . . ." In other words, the court concluded that it would be reasonable to treat work charged at a rate of 2 percent as requiring more than just writing checks and answering telephone calls, despite McCullough's apparent contention to the contrary at trial. Implicit in this finding is the court's apparent conclusion that it would be unreasonable to allow 2 percent as the fee for ordinary services and then pile on top of the 2 percent an additional $375 per hour, especially since McCullough claimed that virtually all his services should be compensated at that rate. The court was entitled to conclude McCullough's demand for extraordinary fees was unreasonable under these circumstances and, consequently, to make reductions in the amount awarded. (See Cal. Rules of Court, rule 7.703(a).)

The court found there were "numerous irregularities and outrageous billings for payments to himself," providing examples of these. It also noted that the trustee could not substantiate many of his claims, either through trial testimony or documentary evidence (some of which had been "destroyed for unknown reasons"). McCullough's "Summary of Services" lacked particularity. Moreover, some of the services McCullough described as extraordinary could not by any measure be deemed extraordinary or "'outside and beyond the general duties'" of the trustee. (*Estate of*

23

*Bissinger*, *supra*, 60 Cal.2d at p. 770.)  From this evidence, the court was entitled to draw the conclusion of ultimate fact that McCullough's charges were inflated.

It might be that the court determined that it was appropriate to reduce McCullough's claim for extraordinary fees by a certain percentage.  Alternatively, it might be the court added up certain charges and deducted that sum from the claim.  It is unnecessary for us to know what the percentage or the particular charges were.  They are not ultimate facts.

Moreover, even if there had been material omissions in the statement of decision as to the amounts awarded, such an error would have been harmless because there is no percentage or particular charge that was material and, if revealed, would destroy all other findings so as to compel a finding in favor of McCullough.  (*Sperber v. Robinson*, *supra*, 26 Cal.App.4th at p. 745.)  Thus, any error would have been harmless.  (*Ibid.*)

### 4. *McCullough's other arguments lack merit*

McCullough contends the trial court failed to take into consideration the factors set forth in *Estate of Nazro* (1971) 15 Cal.App.3d 218, 221, which were codified for the most part in California Rules of Court, rule 7.776.

To the contrary, the trial court considered the applicable factors.  As to the "success or failure of the trustee's administration," the court noted McCullough had ably performed his duties and that his services had benefited the Trust.  As to "any unusual skill, expertise, or experience brought to the trustee's work," the court acknowledged McCullough had expertise in the area of trusts.  As to the "time spent in the performance of the trustee's duties," the court was prevented from making any specific observations because McCullough did not provide records from which the time he had spent could be determined.  As to the "custom in the community," the court found the fee for ordinary services of 2 percent was "at the very high end of reasonable fees," and the hourly rate of $375 was excessive for work that did not require the skill and expertise of an attorney, such as obtaining or delivering documents, banking, or managing real estate.  As to the nature of the work and the result achieved and the difficulty and complexity of the tasks performed, the court found the charges unreasonable in view of the ordinary nature of the

work for which fees for extraordinary services were claimed, to the extent the court could figure out what extraordinary services had been performed.

McCullough also contends the trial court "misapplied the law" by categorizing the litigation he engaged in with respect to the Sherman Oaks property and the sale of the Hawaii and Sherman Oaks properties as ordinary services. However, enforcing claims, delegating powers to an agent and exercising general supervision over agents such as attorneys and realtors may be considered ordinary services. (Prob. Code, §§ 16010, 16012, subd. (b).) The court acted within its discretion in considering McCullough's supervision of the attorneys handling the real properties as ordinary services. In fact, even though McCullough had destroyed the monthly statements from the attorneys he hired to handle the unlawful detainer and the settlement agreement, the court approved payment to them of $37,850.84 as extraordinary fees.

Given the inadequate and inaccurate state of the documents and testimony McCullough submitted to support his claim for extraordinary fees, we reject his contention that he properly established his compensation under the Trust.

Similarly, McCullough cannot be heard to complain the trial court failed to articulate an appropriate rate for his extraordinary services, as the inadequate state of McCullough's documentation prevented the court from doing so. In the same vein, the court was entitled to reject McCullough's claim that he, rather than the attorneys, had performed the bulk of the admittedly extraordinary services necessitated by the unlawful detainer, settlement of Weiner's potential claim to a life estate, and sales of the properties, as he had discarded their bills and had not kept time records reflecting his services.

Contrary to McCullough's arguments, substantial evidence supports the trial court's findings as to his compensation for extraordinary services. He has not made any "manifest showing of abuse" or established that trial court's findings "exceeded the bounds of reason." We conclude the trial court's reduction in extraordinary fees was not an abuse of discretion.

25

**5.** *Due to a simple mathematical error, however, the trial court must specify the dollar amount McCullough is ordered to reimburse the Trust*

The trial court determined McCullough had paid himself $212,371.40 in total payments. McCullough was entitled to receive $138,675.09 through December 31, 2011 (ordinary fees in the amount of $70,348.94; extraordinary fees in the amount of $26,600; $3,839.31 in costs; and $37,850.84 to independent contractor attorneys). He was entitled to additional fees of $19,854.74 for additional services through December 31, 2012 (ordinary fees of $4,685.74; work related to preparation of a trust accounting of $12,150; unbilled extraordinary fees of $3,019; fees and reimbursed expenses in the amount of $4,613.78).

We note a mathematical error in that the amounts comprising the additional fees through December 31, 2012, add up to $24,468.52 rather than, as the court calculated, $19,854.74. The amount of $138,675.09 plus $19,854.74 equals $163,143.81. Accordingly, as a matter of simple math, $212,317.40 minus $163,143.81 equals $49,173.59.

We remand with an order to the court to specify the precise amount McCullough shall reimburse to the Trust and distribute to Williams.

## DISPOSITION

The trial court is ordered to specify the precise amount McCullough is ordered to reimburse the Trust and to enter a judgment reflecting that amount.  In all other respects, the judgment is affirmed.  Williams is entitled to his costs on appeal.

NOT TO BE PUBLISHED.


                                                    MILLER, J.*

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

---

**\*** Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.